IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

KATHY ARMSTRONG OWENS                          PLAINTIFF

VS.                                NO. 1:09CV116-A-D

LEE COUNTY, MISSISSIPPI;
SHERIFF JIM H. JOHNSON, individually
and in his official capacity as Sheriff
of Lee County, Mississippi;
LEE COUNTY SHERIFF'S DEPARTMENT;
AND JOHN DOES 1-20; individually and
in their official capacities as officers
of Lee County, Mississippi          DEFENDANTS


**********************************************************

DEPOSITION OF KATHY ARMSTRONG OWENS

**********************************************************


TAKEN AT THE INSTANCE OF THE DEFENDANTS
IN THE LAW OFFICES OF MITCHELL, MCNUTT & SAMS, P.A.
105 SOUTH FRONT STREET, TUPELO, MISSISSIPPI
ON JANUARY 26, 2010, BEGINNING AT 1:38 P.M.


APPEARANCES NOTED HEREIN


Reported by:  KAYLA B. CUMMINGS, CSR 1752

ADVANCED COURT REPORTING
P.O. BOX 761
TUPELO, MS 38802-0761
(662) 690-1500

ORIGINAL

EXHIBIT
A

```
 1   APPEARANCES:

 2   For the Plaintiff:      W. BRENT MCBRIDE, ESQUIRE

                             McBride Law Firm, PLLC

 3                           P.O. Box 84

                             Tupelo, MS 38802

 4                           (662) 690-9288

 5

     For the Defendants:     WILLIAM C. MURPHREE, ESQUIRE

 6                           Mitchell, McNutt & Sams, P.A.

                             105 South Front Street

 7                           P.O. Box 7120

                             Tupelo, MS 38802

 8                           (662) 842-3871

 9                           GARY L. CARNATHAN, ESQUIRE

                             Carnathan & McAuley

10                           316 North Broadway Street

                             P.O. Drawer 70

11                           Tupelo, MS 38802

                             (662) 842-3321

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

## TABLE OF CONTENTS

2   WITNESS                                             PAGE

3   KATHY ARMSTRONG OWENS

4      Examination by Mr. Murphree........    4

5   (No Exhibits)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      KATHY ARMSTRONG OWENS, after being duly

2  sworn, testified as follows:

3                    EXAMINATION

4  BY MR. MURPHREE:

5      Q.  ~~Ms. Owens, as Mr. McBride said, my name is~~

6  Bill Murphree and this is Mr. Gary Carnathan seated

7  over here on this side of the table as well.  Mr.

8  Carnathan is the attorney for the Lee County Board of

9  Supervisors and he and I are working together on this

10  case that your attorney has filed -- your attorneys

11  have filed on your behalf here in federal district

12  court.  Have you ever given a deposition before?

13      A.  No, sir.

14      Q.  All right.  Let me just explain a few things.

15  Now, as you can see, we have a court reporter here.

16  You've been given an oath.  This testimony can be used

17  in court, so it's important that you listen carefully

18  to the questions and answer as accurately as you can.

19      A.  Yes, sir.

20      Q.  Now, I don't think we'll be here too long,

21  but if you need to take a break for any reason, to go

22  to the restroom, get some water, or for any other

23  reason, just let me know and I'll be more than happy

24  to accommodate you.

25      A.  Yes, sir.

1    Q.    Are you taking any medications that would

2  affect your ability to testify here today?

3    A.    Just my regulars that I've been on.

4    Q.    Okay.  What are those?

5    A.    Lortab, and Ultram, and Zantac, and Flexeril.

6    Q.    Okay.  Well, now, I'm familiar with some of

7  those and I think they can put you in kind of a

8  relaxed mode, shall we say?

9    A.    I'm okay.

10    Q.    All right.  I mean, is there any -- do you

11  feel like it's going to affect your thinking, your

12  ability to communicate in any way?

13    A.    No, sir.

14    Q.    Okay.  If, as we go along during the

15  deposition, you start feeling any ill effects or if

16  you start feeling confused for any reason, stop me and

17  let me know.  All right?

18    A.    Yes, sir.

19    Q.    Now, when our court reporter finishes this

20  deposition she'll put it in typed form.  You and your

21  attorney will receive a copy and you will need to read

22  it and sign it.  Now, there are a couple of reasons

23  for doing this.  One is that sometimes when people

24  testify they make honest mistakes.

25    A.    Uh-huh (Indicating yes).

1  Q.   Say the 20th of the month when they meant the

2  15th of the month or ten o'clock in the morning when

3  they meant ten o'clock at night.  And sometimes court

4  reporters, despite their best efforts, misunderstand

5  something that you say and get it wrong.  So now,

6  you'll have an opportunity to read through there and

7  correct any mistakes that you see.  There will be a

8  sheet that'll come along with it.  You have 30 days to

9  do this.

10  A.   Okay.

11  Q.   Now, they'll be a certificate with it that

12  you'll need to sign even if you don't make any changes

13  because this shows that you have had an opportunity to

14  read the deposition.

15  A.   Okay.

16  Q.   Now, if you have any questions about any of

17  this just contact Mr. McBride or Mr. Moffett and they

18  can assist you.  Okay?

19  A.   Okay.

20  MR. MURPHREE:  Usual stipulations, Brent?

21  MR. MCBRIDE:  Yes.

22  Q.   (Mr. Murphree)  Okay.  Now, if you would, for

23  the record, state your full name, Ms. Owens.

24  A.   Kathy Jo Hacker Owens.

25  Q.   Okay.

1    A.    Or Armstrong Owens.  Sorry.

2    Q.    All right.  Now, how old are you?

3    A.    Thirty-nine.

4    Q.    Okay.  What's your date of birth?

5    A.

6    Q.    Okay.  This is a big birthday for you coming

7  up then?

8    A.    Yeah, I'm looking very forward to it.

9    Q.    All right.  Now, is Hacker your maiden name?

10    A.    Yes, sir.

11    Q.    Okay.  Armstrong is a married name?

12    A.    My first husband.

13    Q.    And Owens is a married name?

14    A.    Yes, sir.

15    Q.    All right.  Where do you live at the present

16  time?

17    A.    Amory.

18    Q.    Okay.  What's your physical address down

19  there?

20    A.                                      Mississippi.

21    Q.    And how long have you lived at this address?

22    A.    About three years.

23    Q.    Are you a native of Monroe County?

24    A.    Yes, sir.

25    Q.    All right.  Did you grow up in Amory?

1    A.   Yes, sir.

2    Q.   Now, beside -- where did you live before you

3  lived at your present address?

4    A.   Alabama --

5    Q.   Okay.  Where --

6    A.   -- with my second husband.

7    Q.   Where in Alabama did you live?

8    A.   Vernon.

9    Q.   And how long did you live in Vernon?

10    A.   Maybe a year and a half the first time and

11  maybe six months the second.

12    Q.   All right.  Are you presently married?

13    A.   Yes, sir.

14    Q.   And what's your husband's name?

15    A.   George Lee Owens.

16    Q.   And when did you and Mr. Owens marry?

17    A.   2000.

18    Q.   And where did y'all marry?

19    A.   Vernon.

20    Q.   Do you have -- do you and Mr. Owens have any

21  children?

22    A.   No, sir.

23    Q.   Do you have any children from your other

24  marriage?

25    A.   Three.

1    Q.    All right.  What are their names and ages?

2    A.    Tabitha is 20, Hope is 17, and Jonathan is --

3    well, Jason is 14.

4    Q.    Do all three live with you at home?

5    A.    Unh-unh (Indicating no).  Well, one of them

6    is married, the oldest one is married.

7    Q.    Is that Tabitha?

8    A.    Uh-huh (Indicating yes).  The two youngest

9    ones, Jonathan goes back and forth between me and his

10   daddy, but Hope lives with me.

11   Q.    And Hope is the youngest?

12   A.    No, she's the next to the oldest.  She

13   graduates this coming year.

14   Q.    Now, what is Tabitha's husband's name?

15   A.    Brian Berryman.

16   Q.    All right.  And where do they live?

17   A.    In between Smithville and Hatley.

18   Q.    Okay.  On your interrogatory answers you

19   listed the Berrymans as people that have some

20   knowledge about your condition.  Is that who you were

21   talking about?

22   A.    Yes, sir.

23   Q.    Okay.

24   A.    She just knows my condition when I came home

25   and thereafter.

1  Q. Right. Well, we probably need to get

2  depositions from your son-in-law and your

3  daughter-in-law (sic) as well. How can we find them

4  to issue a subpoena to them?

5  A. ~~I can try to. We haven't spoke since~~

6  Thanksgiving.

7  Q. Okay.

8  A. It's a family feud kind of thing going on.

9  Q. But they live somewhere between Hatley and

10  where?

11  A. Smithville. I can get a hold of them.

12  Q. Okay. We just need an address.

13  A. Okay. I don't know their physical address.

14  I just know where they live.

15  Q. What type work does your husband do?

16  A. He's a mechanic.

17  Q. Okay. Were y'all married when this incident

18  at the jail occurred?

19  A. Yes, but we was separated at the time and

20  we're separated since.

21  Q. All right. Are you living together now?

22  A. No.

23  Q. Okay. What is his address, do you know?

24  A. Not right off hand I don't.

25  Q. Does he live somewhere in Amory?

1    A.    He lives in Vernon.

2    Q.    Vernon.  Do you know who he works for?

3    A.    No.  I know he works for a guy that owns a

4  car lot and a store.

5    Q.    Do you know the fellow he works for, what his

6  name is?

7    A.    Just his first name, Todd.  We just started

8  speaking again over the past year.

9    Q.    All right.  Now, your first husband, what was

10  his name?

11    A.    Paul Armstrong.

12    Q.    And he lives in Vernon?

13    A.    Unh-unh (Indicating no).  He lives in

14  Aberdeen.

15    Q.    Do you know his address?

16    A.    50276 Burr Road I think.

17    Q.    Burr, B-U-R-R?

18    A.    Yes, sir.

19    Q.    Does he have any knowledge of what occurred

20  down at the jail or your condition after that?

21    A.    Just what he was told and what he's seen

22  since then.

23    Q.    Okay.  What type work does he do?

24    A.    He's disabled.

25    Q.    So he doesn't work anywhere these days?

1    A.    He did work for the City of Amory for almost

2    16 years.

3    Q.    Okay.  What type work did he do?

4    A.    Drove the garbage truck and the leaf truck.

5    Q.    Okay.  Have you been married to anybody else

6    besides Mr. Owens and Mr. Armstrong?

7    A.    No, sir.

8    Q.    Okay.  Now, when did you and Mr. Armstrong

9    divorce?

10   A.    Ninety-seven, I think.

11   Q.    And where did you get the divorce, what

12   court?

13   A.    Amory -- Aberdeen.

14   Q.    Chancery court in Aberdeen?

15   A.    I think so.

16   Q.    Okay.

17   A.    Now, I don't remember.  That's been a long

18   time.  Our lawyer was Mr. Fagan.

19   Q.    I don't believe he's around anymore, is he?

20   A.    I don't know.  I hadn't heard nobody talk

21   about him lately.

22   Q.    Okay.  Now, back on January 30th of 2008, --

23   A.    Yes, sir.

24   Q.    -- were you working anywhere at that time?

25   A.    I was an escort driver for -- I was working

1   for an individual that was hauling trailers.

2      Q.   All right.  And who was that individual?

3      A.   Jason Stanford.  I've tried to contact him.

4   I can't get in touch with him.

5      Q.   Where does he live?

6      A.   On 278.

7      Q.   Okay.  Close to Amory?

8      A.   Uh-huh (Indicating yes).

9      Q.   Okay.  If you will, say yes or no.

10      A.   Oh, okay.

11      Q.   Okay.

12      A.   Yes, sir.

13      Q.   All right.  And what was the name of his

14   business?

15      A.   Just Stanford's Escort Service.

16      Q.   Did you work full-time for him?

17      A.   Just whenever he needed me.

18      Q.   Now, we had -- in some of these discovery

19   requests we sent, interrogatories or request for

20   production of documents, we asked for income tax

21   returns.

22      A.   I didn't work long enough to file any income

23   tax with him.

24      Q.   All right.  When's the last time that you

25   filed an income tax return?

1     A.   It's been a while.  I don't really remember.

2     Q.   Several years?

3     A.   Uh-huh (Indicating yes).

4     Q.   Okay.  Remember to say yes or no.

5     A.   Yes.

6     Q.   Okay.  Now, when you did work for Mr., what

7 was his name again, Stanford?

8     A.   Stanford.

9     Q.   Did he pay you by the hour?

10    A.   Paid me by the mile.

11    Q.   All right.

12    A.   I don't remember exactly how much a mile.

13    Q.   But now, do I understand you are making a

14 claim for loss wages in this lawsuit?

15    A.   Yes, sir.

16    Q.   All right.  How much -- in an average month,

17 how many -- how much money would you earn from Mr.

18 Stanford?

19    A.   It just depended on the trip and the miles.

20    Q.   Well --

21    A.   Some weeks I would have one trip.  Some weeks

22 I'd have two trips, and sometimes, you know, it would

23 be a couple of weeks before we had a trip.

24    Q.   Can you give me an average amount that you

25 would earn in a month?

1    A.    I don't really know.

2    Q.    But Mr. Stanford would have this information?

3    A.    Yeah, he should.

4    Q.    All right.  And you're trying to get in touch

5    with him?

6    A.    Yes, sir.

7    Q.    Okay.  How long did you work for Mr.

8    Stanford?

9    A.    A few months.  Maybe three or four months.

10    Q.    And this was in 2008 or 2007?

11    A.    Yeah, seven.  Yes, sir.

12    Q.    Where did you work before that?

13    A.    Just at various convenient stores.  I was a

14    stay-at-home mom for a long time.

15    Q.    I see.  Would you work full-time at these

16    convenient stores or just part-time?

17    A.    Part-time.

18    Q.    Okay.  Did you have to take a physical

19    examination before you went to work for Mr. Stanford?

20    A.    No, sir.

21    Q.    So you can't tell me how many days' work that

22    you may have missed as a result of what happened at

23    the jail?

24    A.    No, sir, because he had to hire somebody

25    else.

1     Q.   Okay.  Have you worked anywhere since you

2 were in jail?

3     A.   I worked at the WIC office for a few months.

4     Q.   Now, what is that?

5     ~~A.~~   ~~WIC Distribution where they give women and~~

6 children milk and --

7     Q.   I see.

8     A.   -- formula.

9     Q.   Where was that?

10    A.   Amory.

11    Q.   Amory.  How long did you work there?

12    A.   Maybe four or five months.

13    Q.   Do you remember when you started?

14    A.   No, sir.

15    Q.   Do you remember when you ended?

16    A.   Maybe July or August.

17    Q.   Of 2008?

18    A.   Yes, sir.

19    Q.   And you haven't worked anywhere since?

20    A.   Unh-unh (Indicating no).  I only made $300 a

21 month.

22    Q.   At WIC?

23    A.   Yes, sir.

24    Q.   And why did you leave that job?

25    A.   Because I had to have surgery on both of my

1    shoulders and I had to take off a lot of time.  And

2    then I got Pneumonia in June.

3        Q.   Okay.  Was Jason Stanford your boss when you

4    worked for him?

5        A.   Yes, sir.

6        Q.   Okay.  Now, can you give us your Social

7    Security number?  We won't reveal it outside this

8    lawsuit.

9        A.

10       Q.   Now, at any time, have you ever drawn Social

11   Security benefits or disability?

12       A.   On myself?

13       Q.   Yes, ma'am.

14       A.   No, sir.

15       Q.   Have you applied for Social Security

16   disability?

17       A.   I applied one time and I was denied.

18       Q.   When was that that you applied?

19       A.   It was maybe in -- I don't -- it was some

20   time last year.  I don't remember when.

21       Q.   After this incident at the jail?

22       A.   Yes, sir.

23       Q.   Okay.  And did you go through the office here

24   in Tupelo?

25       A.   Columbus.

1    Q.    Columbus.  And you were denied and you didn't

2  appeal it?

3    A.    No, sir.

4    Q.    Okay.  Have you ever received any type of

5  disability payments from a private insurance company?

6    A.    No, sir.

7    Q.    Okay.  How much education do you have?

8    A.    I quit in the ninth grade and went to work at

9  a garment plant.

10    Q.    Do you have a GED?

11    A.    No. I was in the process of going back to get

12  my GED when this happened.

13    Q.    I see.  Now, at any time have you tried to

14  get life insurance or health insurance and been turned

15  down because of your health?

16    A.    Unh-unh (Indicating no).

17    Q.    Remember to say yes or no.

18    A.    No, sir.  I'm sorry.

19    Q.    All right.  At any time have you ever gotten

20  life insurance or health insurance and had to pay a

21  higher premium because of your health condition?

22    A.    No, sir.

23    Q.    Now, of course, you've been involved in a

24  divorce, but other than that divorce, have you ever

25  been involved in any kind of legal action other than

1    this lawsuit?

2        A.    No, sir.

3        Q.    Now, I'm not trying to embarrass you, but I

4    have to ask this, have you ever pleaded guilty or been

5    convicted of any crime?

6        A.    I've pled guilty, yeah.

7        Q.    And what did you plead guilty to?

8        A.    Possession of marijuana.

9        Q.    All right.  And when was that?

10       A.    It's been a many a year ago and here recently

11   I claimed somebody else's.

12       Q.    All right.  For the conviction for marijuana

13   possession several years ago, what kind of sentence

14   did you get?

15       A.    I just paid my fine.

16       Q.    It was a misdemeanor?

17       A.    Yes, sir.

18       Q.    Now, you said that you -- here recently

19   you've done what?

20       A.    I claimed somebody else's paraphernalia as

21   mine.

22       Q.    And when was that?

23       A.    I don't know.  It's been maybe eight or nine

24   months ago.

25       Q.    All right.  Tell me how that happened.

1    A.    Well, we was riding around and they had it

2  and if they claimed it they went to prison, so I

3  claimed it.

4    Q.    All right.  Did you plea guilty to a charge?

5    A.    Yeah, it was a joint.

6    Q.    And what was the charge, possession?

7    A.    Yes, sir.

8    Q.    And did you get any kind of sentence from

9  that?

10   A.    Yes, I lost my license and everything.

11   Q.    Lost your driver's license.  Did you have to

12 pay --

13   A.    I get them back.

14   Q.    Did you have to pay a fine?

15   A.    Yes, sir.

16   Q.    But you didn't have to go to jail?

17   A.    No, sir.

18   Q.    Okay.

19   A.    Game warden got me, not the law.

20   Q.    It was a game warden?

21   A.    Yes, sir.

22   Q.    But did you go to justice court and --

23   A.    Yes, sir.

24   Q.    -- plead guilty?  Was that down in Monroe

25 County?

1      A.    Yes, sir.

2      Q.    When will you get your license back?

3      A.    I can get them back when my fine is paid off.

4      Q.    You haven't finished paying it yet?

5      A.    No, sir.

6      Q.    How much was it?

7      A.    I don't quite remember.  My mama paid it

8   because I wasn't able to.

9      Q.    Now, at any time in your life, have you ever

10  been committed to an institution because of alcohol or

11  drug addiction?

12     A.    No, sir.

13     Q.    Ever been through any kind of rehab?

14     A.    No, sir.  I signed myself into Behavioral

15  Health one time and I left the third day.

16     Q.    Behavioral Health where?

17     A.    Tupelo.

18     Q.    Here?

19     A.    That's been 15 years ago.

20     Q.    Was that because of alcohol, drugs, or some

21  other problem?

22     A.    It was just because I needed it.  My brother

23  had gotten murdered.  He got killed.

24     Q.    I see.  I don't suppose you've ever been in

25  the Armed Forces, have you?

1      A.    No, sir.

2      Q.    At the time this incident down at the jail

3 happened that we'll go into more detail later, did you

4 have any kind of health or hospital insurance?

5      A.    Medicaid.

6      Q.    Medicaid?

7      A.    Yes, sir.

8      Q.    And has Medicaid paid some of your medical

9 bills?

10     A.    Yes, sir.

11     Q.    But not all of them, I see?

12     A.    Well, everything I've had to do.

13     Q.    Okay.  Do you have any out-of-pocket expenses

14 for medical bills that you've paid?

15     A.    Just the co-pay and my prescriptions.

16     Q.    All right.  How much is your co-pay?

17     A.    Three dollars a visit, $3 a prescription

18 unless they're not covered.

19     Q.    Okay.  Now, before this incident down at the

20 jail where you were supposedly assaulted by this other

21 woman, had you ever sustained any kind of injury as a

22 result of an accident or in any other way?

23     A.    I pulled a muscle in my shoulder, yes, sir.

24     Q.    All right.  How did you do that?

25     A.    Working, lifting a regular size car tire and

1    putting it in the back of the truck.

2        Q.   Was this working for Mr. Stanford?

3        A.   Yes, sir.

4        Q.   But it was just a pulled muscle?

5        A.   Yes, sir.

6        Q.   Nothing more?

7        A.   No.

8        Q.   Okay.  And that's the only other injury that

9    you've had, serious?  I mean, I'm talking about

10    serious injuries, not bumps and bruises.

11        A.   In my life?

12        Q.   Yes.

13        A.   I had a broke leg.  I got two metal plates

14    and eight screws in my left ankle.

15        Q.   When did that happen?

16        A.   2000.

17        Q.   And how did you do that?

18        A.   Fell out the back of a pickup truck.

19        Q.   Were you working for Mr. Stanford then, too?

20        A.   No, I was just sitting in the back of a

21    pickup truck.

22        Q.   All right.  And which leg is it?

23        A.   My left leg.  My left ankle.

24        Q.   Where did you have that surgery done?

25        A.   Tuscaloosa, Alabama.

1   Q.   And how are you doing with that injury?

2   A.   It's fine.

3   Q.   Don't have any problems?

4   A.   Unh-unh (Indicating no).

5   Q.   And they're leaving the plate in there?

6   A.   Uh-huh (Indicating yes).

7   Q.   Remember to say yes or no.

8   A.   Yes, sir.  I'm sorry.

9   Q.   Any other injuries that you can think of?

10  A.   No, not that I can think of now.

11  Q.   Have you ever had any serious illness or

12  disease?

13  A.   No, sir.

14  Q.   Do you remember who the doctor was that

15  operated on you over there in Tuscaloosa?

16  A.   No, sir.  That's been ten years ago.

17  Q.   Now, exactly what injuries do you claim that

18  you got as a result of this assault down at the jail?

19  A.   Well, I had to have rotary cuffs put in.

20  Q.   Had to have what?

21  A.   I had to have both -- surgeries on both

22  shoulders.

23  Q.   Okay.  You had rotator cuff surgery?

24  A.   I don't know the medical terms for them.

25  Q.   All right.  But anyway, you had to have both

1 surgeries (sic) operated on?

2    A.    Yeah, and I'm having neck trouble.  I have

3 headaches.

4    Q.    All right.  Let's -- I tell you what, let me

5 -- let's talk about the shoulders a bit first.  When

6 did your start -- first of all, you had had -- you had

7 pulled a muscle --

8    A.    Uh-huh (Indicating yes).

9    Q.    -- with this tire back in 2000, but you say

10 that you've recovered from that and it wasn't giving

11 you any problems?

12    A.    No.

13    Q.    Is that correct?

14    A.    Yeah.

15    Q.    Okay.  When did you --

16    A.    No.  The 2000 is when I broke my ankle.

17    Q.    I see.  When was it you had the trouble with

18 your pulled muscle?

19    A.    The pulled muscle is when they come and got

20 me to bring me back to jail for not appearing in

21 court.  I was at the Amory Hospital when the, what you

22 call them people, bounty hunters --

23    Q.    Yeah, bondsmen?

24    A.    Yeah.

25    Q.    So you were there at the Amory Hospital for

1   your shoulder?

2       A.    Yes, for a pulled muscle.

3       Q.    For a pulled muscle.  All right.  What -- but

4   did you injure your shoulders further down here while

5   you were in jail?

6       A.    Yes, sir.

7       Q.    And you had to have surgery on both of them?

8       A.    Yes, sir.

9       Q.    Who did the surgery on your shoulders?

10      A.    Turba, Dr. Turba.

11      Q.    Is he in Amory?

12      A.    Yes, sir.

13      Q.    Which shoulder did he operate on first?

14      A.    This one (Indicating).

15      Q.    Left?

16      A.    Left one.

17      Q.    And when was that that he operated on it?

18      A.    I think it was September the 17th.

19      Q.    Of '08?

20      A.    Yes, sir.

21      Q.    And when did he operate on the right one?

22      A.    Last year, end of last year.

23      Q.    Some time in '09?

24      A.    Yeah, it's been about maybe three or four

25  months ago.

1    Q.    Okay.  And it was Dr. Turba who operated on

2   both of them?

3    A.    Yes, sir.

4    Q.    Did you receive any other injuries while you

5   were in the jail down there as a result of this

6   assault?

7    A.    Yes, sir.

8    Q.    What was that?

9    A.    I've still got a knot on the back of my head,

10  and I still have headaches, and I'm having neck pain.

11  And I can either take injections in my neck, needles,

12  or I can have surgery.

13   Q.    And you haven't had any problem with your

14  neck before this happened down at the jail, either?

15   A.    No, sir.

16   Q.    Did you get any cuts down there as a result

17  of this assault?

18   A.    I think I had a busted -- inside of my lip

19  was busted.

20   Q.    Did you have to have any stiches?

21   A.    Unh-unh (Indicating no).

22   Q.    Remember to say yes or no.

23   A.    No, sir.  I'm sorry.

24   Q.    All right.  Well, after you -- I think you

25  left the jail the 31st; is that right?

1   A.   Yes, sir, I think.

2   Q.   And did your mother take you to the emergency

3   room here at the hospital then?

4   A.   Yes, sir.

5   Q.   Did y'all go straight to the emergency room?

6   A.   Yes, sir.

7   Q.   And what did they do for you at the emergency

8   room?

9   A.   At first they thought I had a cracked skull.

10   Q.   Okay.

11   A.   My head -- I was passing out all through the

12   night in jail.  They took me in there, they had told

13   Mama not -- they didn't want me up walking until Dr.

14   Bobo got out of surgery.  He got out of surgery and he

15   -- I don't remember everything that was said, but all

16   I know is he said I had a severe concussion or

17   something to that effect.

18   Q.   And what kind of treatment did he give you

19   for this concussion?

20   A.   I know he give me pain medicine and to see a

21   doctor.  It was my -- what he told me to do afterwards

22   and to come back to the hospital if it got worse.

23   Q.   Did you ever have to go back to the hospital?

24   A.   Yeah, a couple of times with headaches.

25   Q.   In Amory or Tupelo?